UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>TROY FAULKNER,<br><br>    Defendant | Case No. 21-CR-126 (BAH) |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Troy Faulkner to 5 months' incarceration, three years of supervised release, $10,560 in restitution, and the mandatory $100 special assessment.

I.  INTRODUCTION

The defendant, Troy Faulkner, a forty-one-year-old house painter from Ohio, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

1

On August 5, 2022, Faulkner pled guilty to Count One of the Indictment, charging Destruction of Government Property, in violation of Title 18, United States Code, Section 1361. As explained herein, a sentence of 5 months' imprisonment, with a three-year term of supervised release to follow, is appropriate in this case because Faulkner kicked-in and broke multiple panes of an external window of the U.S. Capitol Building while at the forefront of the mob attacking the Capitol on January 6, 2021. At first, another rioter attempted to kick in the window while other rioters encouraged him. That rioter was unsuccessful. Not so for Faulkner - with the help of other rioters, Faulkner jumped up onto the exterior window ledge. Employing a backward kicking, mule-like motion, Faulkner used his left leg and foot to shatter two of the windowpanes.

II.     **FACTUAL BACKGROUND**

   A.     **The January 6, 2021 Attack on the Capitol**

On January 6, 2021, hundreds of rioters, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election. Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the

numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

### B.     Faulkner's Role in the January 6, 2021 Attack on the Capitol

Faulkner traveled with a friend from his home in Whitehall, Ohio, to the District of Columbia to attend the so-called "Stop the Steal" rally that took place on January 6, 2021. After attending the rally on January 6, Faulkner travelled with the crowd from the rally to the Capitol building. He was wearing a tan jacket, on the back of which was the name of his personally owned company, "Faulkner Painting."

Sometime after 2:30 p.m., Faulkner, with the physical assistance of two other rioters, climbed onto the exterior window ledge on the west front of the Capitol building. *See* Image 1, below.[2]

---

[2] Undersigned counsel for the government at the plea hearing for Faulkner previously submitted to the Court and moved into evidence a total of five (5) relevant photos which were recovered from the defendant's Facebook pages by law enforcement – three of those photos included herein, and a one minute and eight second (1:08) video taken from an open-source public video platform showing Faulkner unlawfully kicking in the window at the Capitol.



As shown in Image 2 & 3, below, using his left leg, Faulkner repeatedly kicked backwards, striking two of the windowpanes with his left foot, shattering them.

4





Below is a screenshot photo obtained from Faulkner's Facebook page, showing Faulkner on the Capitol Grounds on January 6. Above that photo, one of Faulkner's Facebook friends rhetorically asked Faulkner, "Jeez, man, You wore your company jacket into the middle of the insurrection?"



On January 11, 2021, a Whitehall Ohio Police Department crime intelligence analyst sent to the FBI a captured public Facebook exchange between Faulkner and another individual who followed Faulkner on Facebook. Referring to the January 6 riot, the other individual told Faulkner in a Facebook message, "Both sides are ignorant for fighting with each other." Faulkner replied, "we weren't fighting against antifa we're fighting against the government," and "We took it to there front door unlike the p****ass BLM." PSR ¶ 25. Those statements revealed Faulkner celebrating his unlawful actions at the Capitol Building on January 6 with a disregard to the damage he had done.

However, on January 13, 2021, Faulkner called into the FBI hotline to identify himself as Troy Faulkner, with his date of birth and cell phone number. Faulkner self-reported, *inter alia*, that he had kicked in the windowpanes of the U.S. Capitol and that he was sorry for his actions of causing damage to the Capitol and that he got "caught up in the moment."

C. **Faulkner's Post-Mirandized Statement to the FBI**

After his arrest on January 29, 2021, Faulkner gave an interview to the FBI in which he admitted that, in response to former President Trump asking everyone to go to the Capitol, he, along with others, followed a crowd that walked to the Capitol. At that Capitol, Faulkner stated that he and others were tear-gassed, which made him "pissed off" and provoked him to kick the window at the Capitol. Faulkner said he had no intention of entering the building. In addition, Faulkner admitted that he found a 40-millimeter round of ammunition on the ground of the Capitol and kept it.

8

Faulkner stated he and another individual traveled together from Ohio to D.C. to protest what he called a "rigged election" and to defend former President Trump's people against ANTIFA if the latter showed up on January 6. Faulkner admitted that on January 6, he wore a plastic chest plate, similar to those used in BMX biking, for protection. After kicking the windowpanes, Faulkner and the other individual went back to Ohio. Faulkner further admitted that after returning to Ohio, he burned the jacket he wore on January 6.

### III. THE CHARGES AND PLEA AGREEMENT

On February 17, 2021, a federal grand jury in the United States District Court for the District of Columbia returned a seven-count Indictment charging Faulkner with Destruction of Government Property, in violation of 18 U.S.C. § 1361 (Count One); Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2) (Count Two); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Three); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Four); Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4) (Count Five); Disorderly Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Six); and Stepping, Climbing, Removing, or Injuring Property on the Capitol Grounds, in violation of 40 U.S.C. § § 5104(d) (Count Seven).

On August 5, 2022, Faulkner pled guilty to Count One, felony Destruction of Government Property in violation of 18 U.S.C. § 1361.

## IV.   STATUTORY PENALTIES

Faulkner now faces sentencing on Destruction of Government Property in violation of 18 U.S.C. § 1361. As noted by the plea agreement and the U.S. Probation Office, Faulkner faces up to 10 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

That parties entered into a plea agreement in which they stipulated to a Guidelines calculation that was adopted by the PSR. *Compare* ECF 41 at pp. 2-3 with PSR ¶¶ 33-41. The government therefore agrees with the Sentencing Guidelines calculation set forth in the PSR. That calculation is as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B1.1(a)(2)) | 6 |
| The loss exceeded $6,500 but was less than $15,000 - (specifically- $10,560), two levels are added. USSG §2B1.1(b)(1)(B). | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |

   Total Offense Level                            6

*See* PSR at ¶¶ 33-41.

   The U.S. Probation Office correctly calculated Faulkner's criminal history as category III. PSR ¶ 126. Based on a total offense level of 6, after an adjustment for acceptance of responsibility, Faulkner's Guidelines range is two to eight months' imprisonment. *Id*.

## VI. SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

   In addition to the advisory Sentencing Guidelines, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a 5-month term of incarceration.

### A. Nature and Circumstances of the Offense

   The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

   While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted police on January 6 did so under the most

extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with police.

While assessing Faulkner's individual conduct, this Court should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive, they help to place each defendant on a spectrum of fair and just punishment.

The nature and circumstances of Faulkner's crime weigh in favor of a term of imprisonment. Upon approaching the Capitol, Faulkner unlawfully kicked-in and broke a window at the U.S. Capitol, identified by the Architect of the Capitol (AOC), as United States Capitol Building - S1CR4S. Several days after January 6, Faulkner expressed his satisfaction for what he did on January 6, telling another person in a Facebook post, "We took it to there front door unlike the p****ass BLM."

12

Simply stated, once at the Capitol, Faulkner was not merely an actor who hung back and followed others into the Capitol. He was an instigator who willfully destroyed United States property. His actions, as part of a mob attacking the Capitol, encouraged others to follow suit. These are not the actions of somebody who is simply going along with others, these are the actions of an adult who knowingly participated and encouraged others to commit criminal offenses at the Capitol. This weighs in favor of a term of incarceration.

### B. Faulkner's History and Characteristics

Faulkner has a lengthy criminal history with numerous criminal convictions and incarcerations from 2004 through 2016. His most recent convictions are for Carrying a Concealed Weapon (felony) in 2011, for which after violating the terms of release, he was sentenced in 2015 to 14 months' incarceration, PSR ¶ 50; Aggravated Menacing, also in 2011, for which he was sentenced to 30 days incarceration with 15 days (suspended), PSR ¶ 51, and Operating a Vehicle Under the Influence *Per Se* in 2016, for which he was sentenced to 180 days incarceration, with 177 days suspended, PSR ¶ 52.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3] As with the nature and circumstances of the offense,

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at

13

this factor supports a sentence of incarceration.

Faulkner's criminal conduct, destroying government property in an attempt to breach the Capitol, shows extreme disrespect for the law. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that an attack on the Capitol is not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the

---

https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

[4] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

14

transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a term of incarceration. Faulkner's lengthy criminal history and his actions that day were sufficiently serious that they raise doubts about his willingness to follow the law in the future. Second, although Faulkner called the FBI to turn himself in, that came only after he knew that he had been identified by law enforcement officials as one of the people who attacked the

15

Capitol on January 6. A sentence of incarceration will be the best message that this Court can give to Faulkner to never repeat this conduct.

### E. The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

16

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.     **Unwarranted Sentencing Disparities**

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Faulkner and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 1361 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

To date, only one other defendant has been sentenced for a stand-alone violation of Section

17

1361. In *U.S. v. Hunter Ehmke*, 21-CR-029 (TSC), the defendant, similarly to Faulkner, kicked and punched out three exterior windows of the Capitol Building adjacent to the Rotunda doors on the east side of the building. Unlike Faulkner, he had never been arrested before January 6. Judge Chutkan sentenced Ehmke to four months' incarceration.

In the related situation of property theft during the January 6, Judge Friedrich sentenced Jason Riddle to 3 months' incarceration for his violation 18 U.S.C. § 641. Riddle stole a bottle of wine and the Senate Procedural Manual from the Office of the Senate Parliamentarian. But unlike Faulkner, Riddle not only entered the Capitol, he did so twice, and also entered the Parliamentarian's office as it was being ransacked by others, gave multiple interviews to media outlets about his conduct on January 6, and destroyed evidence by deleting his social media accounts and deleting some messages, photos, and videos from his mobile telephone. On the other hand, Riddle did not have anything like Faulkner's criminal history: Riddle had a single conviction for public drunkenness.

## VII.   RESTITUTION

The Mandatory Victim Restitution Act ("MVRA") requires the sentencing court to impose restitution for violations of Title 18 "in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense." 18 U.S.C. § 3663A(b)(1). *See also* 18 U.S.C. § 3663A(c)(1)(A)(ii) (the MVRA "shall apply in all sentencing proceedings for convictions of, or plea agreements relating to charges for any offense . . . that is . . . an offense against property under this title."). By any definition, "any depredation against any property of the United States," 18 U.S.C. § 1361, is "an offense against property." *See generally United States v. Grady*, 18 F.4th

1275, 1289 (11th Cir. 2021) (affirming restitution order under the MVRA that made all defendants jointly and severally liable for a violation of Section 1361), *cert. denied*, 142 S. Ct. 2871 (2022)

Additionally, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[5] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The Architect of the Capitol has estimated that the cost of the damage to the windowpanes broken by Faulkner is $10,560. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Faulkner must pay $10,560 in restitution to the Architect of the Capitol, which reflects the damage he did to the Capitol.[6] Plea

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

19

Agreement at 10 ¶ 12. Faulkner's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 145.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 5 months and restitution of $10,560, a three-year term of supervised release, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:   */s/ Emory V. Cole*
Emory V. Cole
PA. Bar #49136
Assistant United States Attorney
United States Attorney's Office for D.C.
601 D Street, N.W.
Washington, D.C. 20530
E-mail: Emory.Cole@usdoj.gov
Telephone: (202) 252-7692